

**RIKER
DANZIG
SCHERER
HYLAND
PERRETTI**LLP

ATTORNEYS AT LAW

**Joseph L. Schwartz**
Partner

<u>Direct:</u>
t: 973.451.8506
f: 973.451.8727
jschwartz@riker.com
Reply to: Morristown

September 17, 2014

<u>**Via ECF (Courtesy Copy via Regular Mail)**</u>

Hon. Michael A. Shipp, U.S.D.J.
United States District Court
Clarkson S. Fisher U.S. Courthouse
402 East State Street
Trenton, NJ 08608

Re:   Stier, *et al*. v. T&M Associates, *et al.*
      Case No. 14-1091-MAS

Dear Judge Shipp:

This firm represents defendant T&M Associates ("<u>T&M</u>") in the above-referenced matter initiated by Edwin H. Stier, Chapter 7 trustee (the "<u>Trustee</u>") and Partner Assessment Corporation ("<u>Partner</u>," and together with the Trustee, the "<u>Plaintiffs</u>") as co-plaintiffs.  I am writing to provide the Court with a status update in response to the directive contained in Your Honor's September 10, 2014 Memorandum Order Granting Motion to Withdraw the Reference (the "<u>Memorandum Order</u>").

First, pursuant to a Joint Mediation Order entered on July 24, 2014 (the "<u>Mediation Order</u>") by the Honorable Michael B. Kaplan, U.S.B.J. (the "<u>Bankruptcy Court</u>"), the parties agreed to a stay of all matters, including discovery, in this litigation pending the completion of an agreed-upon mediation, with former Magistrate Judge John J. Hughes (Ret.) as mediator.  That mediation is scheduled to commence on October 3, 2014.  We will certainly advise the Court of the outcome of that mediation.

In the event the mediation fails, the Court would need to understand this case, which is fairly complex and which has a lengthy and detailed history, both factually and procedurally, as set forth below.

A.    <u>**BRIEF INTRODUCTION.**</u>

This lawsuit results from the criminal conduct and ultimate criminal indictment of the Debtors, Birdsall Services Group, Inc. and BSG Engineering, Surveying and Landscape Architecture, LLC (together, "<u>BSG</u>" or the "<u>Debtors</u>"), as well as various of the Debtors' former officers and directors, as a result of a six (6) year scheme through which BSG disguised political contributions by funneling money through BSG employees to elected officials to secure millions

Headquarters Plaza, One Speedwell Avenue, Morristown, NJ 07962-1981 • t: 973.538.0800 f: 973.538.1984
50 West State Street, Suite 1010, Trenton, NJ 08608-1220 • t: 609.396.2121 f: 609.396.4578
500 Fifth Avenue, New York, NY 10110 • t: 212.302.6574 f: 212.302.6628
www.riker.com

Hon. Michael A. Shipp, U.S.D.J.
September 17, 2014
Page 2

of dollars in lucrative public contracts.  The Debtors' criminal conduct and subsequent criminal indictment commenced an unfortunate chain of events that ultimately led to the commencement of this lawsuit.  This chain of events included: (i) the Debtors being criminally indicted in late March 2013, (ii)  the Debtors having their assets frozen by a State of New Jersey Superior Court in response to a request by the New Jersey Attorney General in late March 2013, (iii) the Debtors' inability to make payroll for its approximate 325 employees as a result of the asset freeze, (iv) the Debtors' filing for chapter 11 bankruptcy protection with the Bankruptcy Court on March 29, 2013 (the "Petition Date") in an effort to unfreeze their assets, (v) the Debtors' furloughing of their employees on or about April 11, 2013 and placing them on unemployment for a period of time after the bankruptcy was filed, (vi) many of the Debtors' customers' and employees' termination of their relationships with the Debtors, (vii) the Debtors thereafter settling with the State of New Jersey on or about April 15, 2013, including the Debtors' agreement to cease doing business altogether, along with the Debtors' agreement to have a trustee appointed to liquidate the Debtors' remaining assets, and (viii) the Trustee's subsequent sale of virtually all of the Debtors' remaining assets to co-plaintiff, Partner.

While this unfortunate chain of events was unfolding, over the better part of four (4) months, the Debtors' innocent employees confronted substantial uncertainty surrounding their employment and their ability to support their families and work in their chosen professions.  In the face of this uncertainty, defendant Mark Worthington ("Worthington"), who for years had been a loyal BSG employee, working in the Debtors' Health & Safety Division (the "H&S Division"), began to seek employment and interview with various prospective new employers.  Ultimately, T&M offered employment to Worthington and several members of his "team" in the H&S Division, which Worthington and various other individuals thereafter accepted.  At no time did Partner ever discuss with or offer employment to either Worthington or the majority of the members of his team that ultimately went to work for T&M.

Prior to Worthington's departure from the Debtors' employ, on or about April 15, 2013, the Trustee was appointed as the bankruptcy trustee for the Debtors, and began marketing the Debtors' assets for sale.  At that time, due to the Debtors' criminal indictment and resulting bankruptcy, the Debtors' affairs were in chaos and the Debtors' assets were rapidly declining in value.  This precipitous decline in asset value resulted from, among other things, the Debtors having had their assets frozen, the Debtors' vendors' unwillingness to continue to provide services to the Debtors for fear of not getting paid, the Debtors' resulting inability to service many of their clients, and a mass exodus both by the Debtors' employees and the Debtors' clients.

In connection with the Trustee's marketing the Debtors' assets, in or about early April 2013, Partner executed a nondisclosure agreement with the Trustee and began conducting due diligence.  On or about May 2, 2013, after Worthington had already joined T&M, Partner and the Trustee entered into a letter of intent relating to the sale of the Debtors' assets to Partner.  Following the execution of that letter of intent, on May 3, 2013, the Trustee filed a motion with the Bankruptcy Court seeking to approve Partner as the "stalking horse" bidder with respect to the Trustee's sale of the Debtors' assets, subject to higher and better offers, in accordance with

4529487v6

the letter of intent. Thereafter, on or about May 24, 2013, more than one month after Worthington began working for T&M, Partner and the Trustee entered into a formal asset purchase agreement (the "APA"), which was approved by order of the Bankruptcy Court dated June 6, 2013 (the "Sale Order").

Following Partner's purchase of the Debtor's assets, in June 2013, the Trustee conducted an oral examination of Worthington pursuant to Fed. R. Bankr. P. 2004. During that examination, Worthington candidly testified regarding the state of affairs that existed at BSG following the criminal indictments, employee furloughs and bankruptcy, and further testified that shortly before leaving the Debtors' employ, he downloaded certain documents from the Debtors' computer system to a personal "thumb drive." Plaintiffs pieced together various statements made by Worthington and filed their original complaint, claiming that: (i) Worthington copied the entire H&S Division database onto the thumb drive as he was leaving the Debtors and took this purportedly proprietary and confidential information for the benefit of T&M, (ii) T&M allegedly wrongfully received and used certain of the Debtors' proprietary and confidential information that was "stolen" by Worthington or others and (iii) T&M and Worthington allegedly conspired to violate various restrictive covenants contained in a stockholder agreement to which Worthington was a party. Along with their original complaint, Plaintiffs immediately requested the Bankruptcy Court to enter an injunction prohibiting T&M and Worthington from utilizing the alleged BSG propriety and confidential information, and to direct T&M and Worthington to turn over and return back information to the Trustee and Partner.

T&M and Worthington denied the allegations and requested that the Bankruptcy Court order the Trustee and Partner to identify the confidential and proprietary information contained on the Worthington thumb drive. In response, Partner stated it would identify the alleged confidential information within ten (10) days. To date, no such identification has been provided by Partner. However, Plaintiffs ultimately filed an amended complaint wherein Plaintiffs modified the focus of their complaint, arguing that Worthington and others allegedly violated New Jersey's Computer Related Offenses Act, N.J.S.A. 2A:38A-1, *et seq.* ("CROA"), by copying information from the Debtors' computer system prior to leaving the Debtors' employ. In pursuing these CROA claims, Plaintiffs have alleged that T&M is vicariously liable for the actions purportedly taken by defendants Worthington and Kevin Burns ("Burns") prior to joining T&M, while they were employed by the Debtors.

B. **THE DEBTORS, THEIR CRIMINAL CONDUCT AND THE COMMENCEMENT OF THE BANKRUPTCY CASES.**

Prior to the bankruptcy filings, the Debtors were one of New Jersey's largest engineering and environmental consulting firms, providing services in the areas of building systems, energy and sustainability, environmental and geotechnical, marine, public engineering, regulatory compliance, site development, transportation, waste management and water resources. The Debtors contracted with private and public clients to provide these services and also subcontracted with other service providers and vendors to service these clients. Unfortunately, as it turns out, the Debtors' success was built upon the criminal conduct of certain of its officers and directors,

Hon. Michael A. Shipp, U.S.D.J.
September 17, 2014
Page 4

through which these individuals caused BSG to illegally disguise political contributions by funneling money to elected officials through BSG employees to secure millions of dollars in lucrative public contracts. As a result, on March 26, 2013, the State of New Jersey, Division of Criminal Justice (the "State") filed a criminal indictment against one of the Debtors, BSG, Inc., and several of its former executives alleging, *inter alia*, violations of New Jersey's "Pay-to-Play" statute.

In a separate civil action, on March 26, 2013, the State obtained an order from the Superior Court of New Jersey directing the seizure of substantially all of the Debtors' assets, including their bank accounts (the "Seizure Order"). The Seizure Order left the Debtors without the ability to conduct business due to, among other things, an inability to pay their employees or their vendors. In a an effort to avoid the effectiveness of the Seizure Order, on the Petition Date, the Debtors commenced their chapter 11 cases and immediately petitioned the Bankruptcy Court for relief from the Seizure Order. In response, the Bankruptcy Court immediately entered an order granting the Debtors relief from the Seizure Order. However, following an appeal of an order of the Bankruptcy Court permitting the Debtors to access their bank accounts notwithstanding the Seizure Order, the United States District Court for the District of New Jersey entered an order prohibiting the Debtors from accessing or using those funds.

As a result, on April 15, 2013, the Debtors and the State reached a consensual resolution over the Debtors' continuing use of assets and funds. Among other things, that settlement prevented the Debtors from conducting operations in New Jersey, provided for the appointment of the Trustee as chapter 11 trustee for the Debtors and directed the Trustee to liquidate the Debtors' assets. On June 13, 2013, BSG, Inc. entered a guilty plea with respect to the criminal charges levied against it.

During this period, the Debtors' innocent employees, including Worthington and his colleagues in the H&S Division, were placed in unfortunate positions, while facing uncertainty surrounding their employment. To make matters worse, there was a fundamental lack of communication, along with certain misrepresentations, from the Debtors' management. To add to this chaos, on or about April 11, 2013, the Debtors furloughed their employees without pay and advised employees to apply for unemployment insurance benefits.

C. **WORTHINGTON AND THE H&S DIVISION.**

Worthington was a minority shareholder of the Debtors, who at various times was the head of the H&S Division. As a minority shareholder, Worthington was a party to a Stockholder Agreement that contained various restrictive covenants, which due to, among other things, the Debtors' bankruptcy filing and ultimate liquidation, are not enforceable as a matter of law. The H&S Division provided various health and safety services to the Debtors' clients, which were primarily public or quasi-public entities. These services included, but were not limited to, asbestos monitoring, abatement and removal, workplace safety and training and other health and

Hon. Michael A. Shipp, U.S.D.J.
September 17, 2014
Page 5

safety related services. The H&S Division had, at various times, approximately 10 – 15 employees.

Following the Debtors' criminal indictment and bankruptcy filing, Worthington, like many of the Debtors' other employees, began looking for new employment. In fact, during the few weeks following the Debtors' bankruptcy filing, Worthington had conversations with several potential new employers, and eventually received and accepted an offer of employment with T&M. As a result, on April 19, 2013, Worthington gave formal notice of resignation to the Debtors, and, on April 22, 2013, Worthington began working for T&M.

During this time, other members of the H&S Division were justifiably concerned about their future employment, and expressed their concerns to Worthington. In response, Worthington indicated that T&M was potentially interested in interviewing these individuals. Subsequently, some of the members of the H&S Division, including defendant Burns,[1] interviewed with and received employment offers from T&M, and became employed by T&M.

D.   **PARTNER'S PURCHASE OF THE DEBTORS' ASSETS.**

Immediately upon the Trustee's appointment, the Trustee embarked on a process to liquidate and sell substantially all of the Debtors' assets. In or about late April 2013, Partner expressed interest in purchasing the Debtors' assets, and on or about May 2, 2013, Partner and the Trustee signed a letter of intent regarding a potential transaction for the purchase of the assets for the principal sum of $5,600,000. Following the execution of the letter of intent, on or about May 3, 2013, the Trustee filed a motion with the Bankruptcy Court seeking to approve a sale of substantially all the Debtors' assets to Partner, as the "stalking horse bidder," or to another purchaser who made a higher and/or better offer. In that motion, the Trustee acknowledged the devastating impact of the Debtors' criminal indictments and bankruptcy filings on the company and its employees.

Partner's original $5.6 million offer turned out to be the highest and best offer that the Trustee received. Following the execution of the letter of intent, Partner conducted due diligence, which included various site visits by Partner executives. Ultimately, Partner decided to move forward with its transaction to purchase substantially all the Debtors' assets, and Partner and the Trustee executed the APA, which was dated May 24, 2013.

At the June 5, 2013 hearing regarding the approval of the sale to Partner, the Trustee testified regarding the chaos and dire state of affairs that existed at BSG in April 2013, at or around the time that Worthington joined T&M, noting that the "business was deteriorating in front of [his] eyes." The Trustee further testified that, during the three (3) week period between the March 26, 2013 criminal indictment and his appointment on April 15, 2013, nearly 1/3 of the Debtors' approximately 325 employees left BSG due to the criminal indictments and ensuing chaos discussed herein.

---

[1] Burns joined T&M effective May 13, 2013.

4529487v6

The APA was approved by the Bankruptcy Court by the Sale Order dated June 6, 2013. The closing with respect to Partner's purchase of substantially all of the Debtors' remaining assets occurred on or about June 21, 2013.

E.   **THE TRUSTEE'S EXAMINATION OF WORTHINGTON**

On June 11, 2013, nearly two (2) months after Worthington joined T&M and before Partner closed with respect to its purchase of the Debtors' assets, the Trustee conducted an examination of Worthington pursuant to Fed. R. Bankr. P. 2004 (the "Rule 2004 Examination"). During his Rule 2004 Examination, Worthington admitted that he had downloaded various documents from the Debtors' computer system onto a personal thumb drive prior to leaving the Debtors' employ. Despite Plaintiffs' characterizations of Worthington's testimony before the Bankruptcy Court, Worthington was very clear in his testimony as to the *limited* amount of information that he placed on that thumb drive in the days leading up to his departure, and was also clear about the *minimal* information he subsequently accessed after joining T&M.

Specifically, Worthington testified that on the morning of his departure from BSG, he did various types of work to close out BSG files and ensure continuity of service by BSG for those clients. Worthington testified that on the morning of his resignation from BSG, he did not download the entire H&S Division database, as Plaintiffs have alleged, but instead, he copied approximately fifteen (15) training plans and twelve (12) proposals onto the thumb drive:

> Q.   So you were busy on your computer that morning. Am I correct that during that period of time you also arranged to copy or transfer certain files to your own personal database?
> 
> A.   I have files, correct.
> 
> Q.   What files did you copy -- Birdsall files did you copy for your own use?
> 
> A.   Training and plans that I created.
> 
> Q.   You created while at?
> 
> A.   PMK.
> 
> Q.   Training and planning documents that were in use while you were employed at Birdsall?
> 
> A.   Correct.
> 
> Q.   Let's be as specific as you can. Identify exactly what documents you took in contemplation of your resignation.
> 
> A.   Health and safety plans and training documents.
> 
> Q.   Well, health and safety plans, is that one plan, is it 50 plans? What did you take?
> 
>    * * *

Hon. Michael A. Shipp, U.S.D.J.
September 17, 2014
Page 7

> Q. In addition to those 15 or so varieties of health and safety plans, what else did you take?
>
> A. Some proposals.
>
> Q. Identify each proposal that you took.
>
> A. Monmouth County, Morris County, Hoboken.
>
> Q. Were they specific projects for those municipalities or, excuse me, counties?
>
> A. All health and safety related.
>
> Q. On specific projects?
>
> A. Yes.
>
> Q. So how many separate projects did you take proposals for in those three counties that you identified?
>
> A. One for the health and safety.
>
> Q. One for each of those counties?
>
> A. Yup.
>
> Q. What else did you take?
>
> A. Just health and safety proposals for 15 Linden Board of Ed, Hoboken Board of Ed.
>
> Q. So in all, how many proposals did you take?
>
> A. About 12.

(Worthington Tr. at 26:12-27:8, 27:20-28:18).[2]

Further, Worthington testified that he did not "use documents that belonged to Birdsall" while at T&M (Worthington Tr. at 30:11-22), and further testified that the only information on the thumb drive he even "looked at" while at T&M were documents relating to "[p]roject experience," (Worthington Tr. at 31:19-21), which Worthington explained was essentially a narrative summary he had composed describing his experience while working on various projects. Worthington also specifically testified that the information on his thumb drive <u>was not</u> transferred to T&M's computers and that <u>management at T&M had no knowledge of either the existence of the thumb drive or the data on the thumb drive</u>:

> Q: So the information that you took on the morning before you resigned on the 17th is sitting on the thumb drive?
>
> A. Correct.

---

[2] A copy of the transcript of the Rule 2004 Examination was filed as an exhibit to Plaintiffs' Amended Complaint.

Hon. Michael A. Shipp, U.S.D.J.
September 17, 2014
Page 8

> Q. It hasn't been transferred to any other computers.
>
> A. No.
>
> Q. Whether your personal computers or T&M computers.
>
> A. No.
>
> Q. Your bosses at T&M, however, know that you were tapping that Birdsall information in connection with your work, do they not?
>
> A. Not to my knowledge.
>
> Q. You never discussed it with them.
>
> A. No.

(Worthington Tr. at 33:3-18).

While Worthington testified that he only copied a limited number of documents onto his thumb drive immediately prior to his departure from BSG, the thumb drive contained many thousands of files and documents. This is because Worthington had used this thumb drive for many years to copy files from the Debtors' computer system or from the computer system of Worthington's prior employer so that Worthington could access the information while working from home or in the field. The thumb drive also included numerous personal files having nothing to do with BSG or Worthington's profession.

Shortly after the Rule 2004 Examination, in mid-June 2013, members of T&M's management met with Worthington and learned for the first time of the existence of Worthington's thumb drive. T&M immediately instructed Worthington that he was not permitted to use any BSG information for any purpose. On June 17, 2014, T&M received a letter dated June 14, 2013 from the Trustee's counsel, which alleged, for the first time, that T&M was in possession of BSG proprietary information. Upon receipt of this June 14 letter, T&M began taking additional steps in an attempt to ensure that Worthington and other former BSG employees would not utilize BSG information.

F. **THE JOINT REPRESENTATION AGREEMENT.**

Shortly before commencing this action, Plaintiffs entered into a Joint Representation Agreement (the "JRA"), pursuant to which, *inter alia*, (i) Plaintiffs have agreed to share any damages awarded in this action and (ii) Partner has agreed to pay all of the Trustee's legal fees associated with this litigation. Despite a factual lack of standing to pursue certain claims against T&M that have been asserted in this action (as discussed below in connection with T&M's motion to dismiss), Plaintiffs claim that the JRA gives the Trustee authority to pursue claims against T&M that he does not own and/or gives Partner standing to pursue claims against T&M under the Stockholder Agreement, to which Partner is not a party.

Hon. Michael A. Shipp, U.S.D.J.
September 17, 2014
Page 9

**G. THE FILING OF THE COMPLAINT, THE ORDER TO SHOW CAUSE AND THE LIMITED PRELIMINARY INJUNCTION.**

On or about July 29, 2013, Plaintiffs commenced this action by filing a verified complaint (the "Complaint") in the United States Bankruptcy Court for the District of New Jersey against both Worthington and T&M. The Complaint was based almost entirely upon various statements, many taken out of context, from Worthington's Rule 2004 Examination. The Complaint alleged, under various common law theories, that Plaintiffs were damaged by: (i) Worthington's alleged breach of the restrictive covenants contained in the Stockholder Agreement and (ii) T&M's alleged improper use of certain of the Debtors' alleged proprietary and confidential information, which Plaintiffs alleged was supplied to T&M by Worthington and others.

Specifically, Plaintiffs' Complaint alleged ten (10) counts against both T&M and Worthington for:

1. Enforcement of the automatic stay and turnover of estate property;
2. Avoidance and recovery of post-petition transfers of estate property;
3. Breach of restrictive covenant;
4. Breach of fiduciary duty and duty of loyalty;
5. Conversion;
6. Unjust enrichment;
7. Tortious interference with contract;
8. Tortious interference with business opportunities;
9. Breach of the implied covenant of good faith and fair dealing; and
10. Unfair competition.

With respect to virtually all of these claims, Plaintiffs alleged that by virtue of T&M's and Worthington's purported misappropriation of the Debtors' "proprietary information" and/or violation of the restrictive covenants contained in the Stockholder Agreement, Plaintiffs were damaged, and sought various forms of injunctive relief, monetary damages, punitive damages, and attorneys' fees and costs. However, in their Complaint, and continuing to this date, Plaintiffs failed both to identify the scope or the proprietary or confidential information that T&M had purportedly taken or used, and to describe or identify how either the Trustee or Partner were allegedly harmed by T&M's actions.

With the Complaint, Plaintiffs also filed an application, along with a proposed order to show cause, seeking the entry of a broad temporary restraining order and preliminary injunction. Despite the fact that BSG had committed criminal conduct, filed bankruptcy and had already ceased doing business entirely, coupled with the fact that Partner had never even offered employment to Worthington, Plaintiffs sought drastic injunctive relief, including an order prohibiting Worthington from working in his chosen field or for T&M.

In response, on July 30, 2013, the Bankruptcy Court immediately entered the Plaintiffs' requested order to show cause with temporary restraints, on an *ex parte* basis, granting Plaintiffs' requested broad and drastic temporary injunctive relief against Worthington and T&M.

Hon. Michael A. Shipp, U.S.D.J.
September 17, 2014
Page 10

Thereafter, on one (1) day's notice to T&M and Worthington, on July 31, 2013, the Bankruptcy Court conducted an emergency hearing to consider Plaintiffs' request for a preliminary injunction. At that hearing, in response to T&M's request for specificity concerning the proprietary and confidential information at issue, Partner's counsel advised that it would identify the alleged proprietary and confidential information within ten (10) days.[3]

At the conclusion of that July 31, 2013 hearing, the Bankruptcy Court determined that Plaintiffs had failed to establish their entitlement to the requested broad injunctive relief, and therefore vacated the broad temporary restraints granted the prior day, and instead issued a very narrow preliminary injunction, later memorialized in an August 13, 2013 order (the "August 13 Order"), which simply prohibited T&M and Worthington from using any of the Debtor's "proprietary information" that may have been located on the Worthington thumb drive.[4] The Bankruptcy Court also ordered that a duplicate copy of the thumb drive be provided by Worthington to Plaintiffs and T&M. Worthington complied with this directive.

Notwithstanding the Bankruptcy Court's vacatur of the broad and restrictive temporary restraints, the August 13 Order granted Plaintiffs' request for an expedited evidentiary hearing to determine whether Plaintiffs could establish an evidentiary basis for expanding the limited preliminary injunction to include the broad injunctive relief requested by Plaintiffs. In the August 13 Order, the Bankruptcy Court also scheduled that evidentiary hearing for September 24, 2013. In this regard, and with specific reference to the September 24 expedited evidentiary hearing on Plaintiffs' request for an expanded preliminary injunction, the Bankruptcy Court directed that the parties engage in expedited discovery, including that Plaintiffs receive "limited access to T&M's computer files . . . to ensure that T&M is not in possession of and is not using Plaintiffs' proprietary information."

Despite the Bankruptcy Court's scheduling of an expedited evidentiary hearing at Plaintiffs' request, not only did Partner fail to identify the alleged proprietary and confidential information at issue, but Plaintiffs chose to abandon their request for an expanded preliminary injunction. As a result, the September 24, 2013 evidentiary hearing never occurred and the expedited discovery contemplated by the August 13 order became moot.[5]

---

[3] To date, Partner has never identified the alleged proprietary and confidential information with any specificity.

[4] As discussed in greater detail herein, by order dated March 20, 2014, the Bankruptcy Court modified the narrow preliminary injunction contained in the August 13 Order.

[5] As is discussed below, since August 2013, Plaintiffs have improperly extrapolated the language in the August 13 Order to support their contention that Plaintiffs are entitled to perform extensive and invasive examinations of T&M entire computer network in pursuit of discovery related to Plaintiffs' claims.

4529487v6

Hon. Michael A. Shipp, U.S.D.J.
September 17, 2014
Page 11

H. **T&M'S MOTION TO DISMISS.**

On January 3, 2014, T&M filed a motion with the Bankruptcy Court seeking to dismiss various counts of the Complaint (the "Motion to Dismiss").  Specifically, T&M sought to dismiss Counts Three, Seven and Eight of the Complaint because those counts of the Complaint relied entirely upon the enforcement of the restrictive covenants contained in the Stockholder Agreement, which T&M submits are unenforceable as a matter of law.  T&M argued in its Motion to Dismiss that the Stockholder Agreement and the restrictive covenants contained therein ceased to be enforceable as a matter of bankruptcy law upon the Debtor's bankruptcy filing and subsequent liquidation.  As was set forth by T&M in its Motion to Dismiss, under 11 U.S.C. § 365, the Stockholder Agreement terminated upon the Debtors' bankruptcy filing, terminating the enforceability of the restrictive covenants as a matter of bankruptcy law.[6]

T&M also argued in the Motion to Dismiss that various counts of the Complaint should be dismissed due to lack of standing.  Pursuant to the APA, the Trustee expressly sold to Partner all claims against third parties, such as T&M, while expressly retaining claims against former employees for enforcement of restrictive covenants.  Through Counts Three, Four and Seven of the Complaint, the Trustee sought relief against T&M for claims that the Trustee sold to Partner, causing the Trustee to lack standing to pursue these claims.

T&M also asserted that various claims should be dismissed because Plaintiffs failed to adequately plead the elements necessary to hold T&M liable under those counts.

In response to the Motion to Dismiss, Plaintiffs sought leave to file an amended complaint.  Following full briefing, on March 10, 2014, the Bankruptcy Court conducted hearings on, among other things, the Motion to Dismiss and Plaintiffs' motion for leave to amend the complaint.  After lengthy arguments, at the conclusion of the March 10, 2014 hearing, the Bankruptcy Court advised that it was reserving decision with respect to T&M's Motion to Dismiss.[7]  Additionally, the Bankruptcy Court authorized Plaintiffs to file an amended complaint (the "Amended Complaint"), while preserving T&M's Motion to Dismiss as it may pertain to the Amended Complaint.

---

[6] Due to the procedural nature of the Motion to Dismiss, the Motion to Dismiss only addressed the purely legal issue of whether restrictive covenants contained ceased to be enforceable as a matter of bankruptcy law upon the Debtor's bankruptcy filing.  While T&M believes that Counts Three, Seven and Eight of the Complaint (and the corresponding counts in the Amended Complaint) are subject to dismissal on this basis alone, T&M also submits that the restrictive covenants are not enforceable under New Jersey law.

[7] In this Court's Memorandum Order, the Court indicated that it would decide T&M's Motion to Dismiss.

Hon. Michael A. Shipp, U.S.D.J.
September 17, 2014
Page 12

I.      **PLAINTIFFS' DEPOSITION OF KEVIN BURNS.**

On January 15, 2014, Plaintiffs conducted a deposition of Burns, a former BSG employee who went to work for T&M on May 13, 2013. Burns' deposition was marked confidential and is subject to a confidentiality order entered by the Bankruptcy Court.

T&M acknowledges that, like Worthington, Burns testified that he copied BSG information onto a number of compact discs in the days prior to his departure from BSG. However, contrary to Plaintiffs' representations to the Bankruptcy Court and alleged in the Amended Complaint, the vast majority of that information copied by Burns was not confidential or proprietary, but instead, primarily consisted of publicly-available proposals and reports that Burns had delivered to BSG customers.

Burns was very clear during his testimony that in his extensive work experience, all of the BSG proposals and/or project information that he copied and/or reviewed while at T&M were publicly available and could have been (and in some cases actually were) obtained directly from former BSG clients upon request and/or through OPRA requests.

Further, contrary to Plaintiffs' assertions, Burns did not testify that, while employed by BSG, he solicited clients and encouraged them to move their business to his new employer, T&M. Instead, despite repeated questioning at his deposition on the topic, Burns testified that he informed clients, many of whom no longer wanted to be associated with BSG because of its criminal conduct, that he was not confident that BSG could service their needs. Burns also testified that when clients asked if there were other firms who could service their needs, Burns identified several potential replacement firms, including T&M.

J.      **T&M's MOTION TO VACATE THE PRELIMINARY INJUNCTION.**

As noted above, the Bankruptcy Court's August 13 Order enjoined T&M and Worthington from "using any proprietary information placed on the 'Thumb Drive' by Worthington." From the outset of this litigation, T&M asserted that the injunction language in the August 13 Order was vague and contrary to Fed. R. Civ. P. 65(d), because much of the information on the Worthington thumb drive consists of documents delivered to BSG public clients that is publicly available, causing the information not to be "proprietary information" under applicable law. Moreover, despite repeated attempts, both informally and through formal discovery requests, Plaintiffs have failed to identify with any specificity the information on the Worthington thumb drive that Plaintiffs deem to be proprietary or confidential and used by T&M to Plaintiffs' detriment. Instead, Plaintiffs have simply and improperly asserted that <u>every</u> document both on the Worthington thumb drive and on Burns' compact discs is confidential and proprietary.

As a result of this lack of clarity, T&M risked violating the Bankruptcy Court's preliminary injunction by using information that may happen to be on the thumb drive that T&M does not believe is proprietary, but which Plaintiffs assert is proprietary. As a result, on February 12, 2014, T&M filed a motion with the Bankruptcy Court seeking to vacate or clarify the preliminary

Hon. Michael A. Shipp, U.S.D.J.
September 17, 2014
Page 13

injunction. Following briefing and oral argument, on March 20, 2014, the Bankruptcy Court entered an Order Modifying and Clarifying Court's August 13, 2013 Preliminary Injunction.

K.   **THE AMENDED COMPLAINT.**

On March 21, 2014, Plaintiffs filed the Amended Complaint, which is a thirteen (13) count complaint, alleging claims against all three (3) defendants for:

   1.   Enforcement of the automatic stay and turnover of estate property;
   2.   Avoidance and recovery of post-petition transfers of estate property;
   3.   Breach of restrictive covenant;
   4.   Breach of fiduciary duty and duty of loyalty;
   5.   Conversion;
   6.   Unjust enrichment;
   7.   Tortious interference with contract;
   8.   Tortious interference with business opportunities;
   9.   Breach of the implied covenant of good faith and fair dealing;
   10.  Unfair competition;
   11.  Violation of the New Jersey CROA;
   12.  Violation of the New Jersey Trade Secrets Act, N.J. Stat. Ann. 56:15-1, *et seq.*; and
   13.  Theft of proprietary information.

With the filing of the Amended Complaint, Plaintiffs have altered the focus of their efforts toward their newly-asserted CROA claims. In the event the mediation should prove unsuccessful, T&M will submit pleadings to the Court explaining the legal rationale as to why Plaintiffs' CROA claims have no legal basis.

L.   **DISCOVERY.**

Despite the passage of more than a year since the filing of the Complaint, the Bankruptcy Court did not enter a case management order respecting discovery. Additionally, the parties have not yet exchanged Rule 26(a) disclosures and no Rule 26(f) conference has occurred. Notwithstanding the foregoing, written discovery commenced months ago and limited depositions have occurred. As is discussed below, several discovery-related motions were filed with the Bankruptcy Court, and remain pending, but have been stayed pursuant to the Mediation Order. Moreover, T&M anticipates that, if the mediation is not successful, additional disputes regarding discovery will likely be brought before the Court.

   (i)   **Plaintiffs Written Discovery Requests to T&M and T&M's Responses.**

On or about August 28, 2013, Plaintiffs propounded document requests and interrogatories to T&M. On or about October 4, 2013, T&M formally responded and objected to Plaintiffs' document requests and began producing responsive documents on a rolling basis. Thereafter, on January 6, 2014, T&M formally responded and objected to Plaintiffs' interrogatories.

Hon. Michael A. Shipp, U.S.D.J.
September 17, 2014
Page 14

Following its initial responses to Plaintiffs' document requests, T&M continued producing responsive documents on a rolling basis. To date, T&M has produced to Plaintiffs more than 112,000 pages of responsive documents. Other than perhaps certain electronically stored information ("ESI"), discussed below, T&M has in good faith made every effort to produce to Plaintiffs all documents in its possession or control that are responsive to Plaintiffs' document requests. Following a March 19, 2014 "meet and confer" conference among the parties, on May 1, 2014, T&M provided Plaintiffs with supplemental responses and objections to Plaintiffs' document requests and interrogatories, in the manner that was agreed upon among the parties during the March 19 "meet and confer."

### (ii)    T&M's Written Discovery Requests to Plaintiffs and Plaintiffs' Responses.

On September 16, 2013, T&M propounded an initial set of written discovery requests, including requests for the production of documents (the "Document Requests") and interrogatories (the "Interrogatories," and together with the Document Requests, "T&M's Discovery Requests"), on each of the Plaintiffs. Following a stay of discovery last fall relating to an unsuccessful initial mediation, and after T&M complained that Plaintiffs had failed to respond to T&M's Discovery Requests, the Bankruptcy Court directed the Plaintiffs to respond to T&M's Discovery Requests by early January 2014.

In accordance with the Bankruptcy Court's directives, Plaintiffs produced various documents to T&M in early January 2014, and also served upon T&M objections and responses to T&M's Discovery Requests. Despite Plaintiffs' facial compliance with the Bankruptcy Court's directive, Plaintiffs discovery responses have been less than forthcoming.

Specifically, although Partner has produced 107,017 pages of documents to T&M in response to T&M's Discovery Requests, Partner's production lacks good faith. Of the documents produced, 77,600 pages, or 73% of the total pages produced, represent a document dump by Partner of all of the documents contained on the Worthington thumb drive, documents that Partner knew were already in T&M's possession.

The lack of good faith in the Trustee's document production in response to T&M's Document Requests has been even more appalling. To date, the Trustee has produced to T&M 8,331 documents, consisting of 175,297 pages. Like Partner, approximately seventy percent (70%) of the documents produced by the Trustee, amounting to 5,827 documents or 77,600 pages, are also nothing more than a dump by the Trustee of all the documents contained on the Worthington thumb drive.

Of the remaining 2,504 documents, which consist of 97,697 pages, T&M estimates that approximately seventy (70%) to eighty (80%) percent of the pages produced by the Trustee are blank pages. This means that of the 175,297 total pages produced by the Trustee to date, only

4529487v6

Hon. Michael A. Shipp, U.S.D.J.
September 17, 2014
Page 15

approximately 20,000 to 30,000 pages (or approximately 11% to 17% of the total production) potentially contain meaningful and responsive information.[8]

As noted above, on March 19, 2014, the parties participated in a "meet and confer" telephonic conference during which, among other things, the various deficiencies with respect to Plaintiffs' production in response to T&M's Discovery Requests were addressed. At the conclusion of the March 19 "meet and confer," it was agreed that the parties would endeavor to supplement their discovery responses and exchange privilege logs by May 1, 2014.

Additionally, during the March 19 "meet and confer," Partner's counsel indicated that it had not completed its ESI searches, wherein it became apparent that: (i) significant quantities of ESI would have to be produced by Partner in response to T&M's Discovery Requests and (ii) a universally-applicable ESI protocol would need to be implemented for all ESI discovery in this case.[9]

Thereafter, the parties embarked on a letter writing campaign, wherein T&M's counsel repeatedly expressed the need for the parties to agree upon a uniformly-applicable procedure for the collection, search and production of ESI, and urged Plaintiffs to open a dialogue regarding such a protocol. During this process, T&M proposed to Plaintiffs, for their comment and review, a written universally-applicable ESI protocol, that Plaintiffs summarily rejected and instead responded to by making an unreasonable and non-negotiable demand that: (i) Partner and/or its agents be entitled to invade T&M's computer system to perform intrusive searches of T&M's computer system without any governing protocol or parameters regarding the search, collection or production of ESI[10] and (ii) Partner and/or its agents be unilaterally entitled to itself search, collect and produce to T&M Partner's ESI in response to T&M's Discovery Requests, also without any ESI protocol governing the parameters of the process and without giving T&M any visibility into how Partner performed these tasks.

---

[8] It should be noted that, it is against this backdrop of discovery malfeasance by the Trustee that the Trustee has sought authority from the Bankruptcy Court to abandon an unknown quantity of the Debtor's records which the Trustee can neither identify nor catalog, and that the Trustee has not reviewed in response to T&M's Discovery Requests. The Trustee's motion to abandon these unknown records has been opposed by T&M and numerous other parties in the Debtors' bankruptcy case, and has been repeatedly adjourned by the Trustee. Currently, the Trustee's motion to abandon unknown records is returnable before the Bankruptcy Court on November 3, 2014.

[9] It later became apparent that the Trustee was in the same position, i.e., that he held a large quantity of potentially responsive ESI that he had neither reviewed nor produced.

[10] T&M assumes that Plaintiffs are basing this demand upon the language contained in the Bankruptcy Court's August 13 Order, regarding Plaintiffs ability to obtain "limited access to T&M's computer files." First, as noted above, the expedited discovery contemplated in the August 13 Order became moot when Plaintiffs abandoned their efforts to expand the preliminary injunction, and, second, Plaintiffs' current demands are far broader than the "limited access" contemplated by the August 13 Order.

4529487v6

Hon. Michael A. Shipp, U.S.D.J.
September 17, 2014
Page 16

To date, Plaintiffs' refusal to produce ESI to T&M, or adequately engage in the discovery process, has both limited T&M's ability to obtain various electronic communications and has prevented T&M from moving forward with its own depositions of Plaintiffs' witnesses.

### (iii) Pending Discovery Motions.

Prior to the Bankruptcy Court's entry of the Mediation Order and stay of these proceedings, several discovery motions had been filed by the parties, and remain pending.

### (a) T&M's Motion to Compel Documents Improperly Withheld on the Basis of Privilege.

On or about May 23, 2014, T&M filed a motion with the Bankruptcy Court seeking to compel Partner to produce certain documents that had been improperly withheld from production on the basis of various asserted privileges in response to a subpoena served by T&M on a Partner employee, Patrick Lorimer.[11]  Following a July 7, 2014 hearing on the motion, on July 17, 2014, the Bankruptcy Court entered an order granting, in part, and denying, in part, T&M's motion.

In so doing, the Bankruptcy Court directed Partner to submit certain of the contested documents to the Bankruptcy Court for an *in camera* review.  Although Partner thereafter submitted certain documents to the Bankruptcy Court, the Bankruptcy Court has not yet ruled on the propriety of Partner's assertion of privilege with respect to those documents.  As a result, that issue is still pending and must be resolved.

The Bankruptcy Court's July 17 Order also required Partner to produce to T&M, on or before July 30, 2014, a supplemental privilege log identifying and describing certain documents responsive to the subpoena that Partner had simply refused to even identify or log, in the first instance.  To date, the supplemental privilege log has not been produced by Partner.

### (b) Partner's Motion to Compel and T&M's Cross-Motion.

On June 13, 2014, in direct response to T&M's motion to compel discovery previously described, Partner filed its own motion seeking to compel production of documents from T&M and Worthington. T&M submits that that motion is a hodgepodge of misstated facts, unsupported allegations and self-serving omissions.

On July 17, 2014, T&M timely filed opposition to Partner's motion to compel, along with a cross-motion seeking entry of an order compelling Plaintiffs to engage in meaningful meet and confer

---

[11] T&M notes that in its privilege log in response to T&M's Document Requests, Partner withheld various documents on the same bases as those asserted by Lorimer.  T&M anticipates filing a similar motion with respect to Partner's privilege log.  Additionally, to date, the Trustee has not produced any privilege log to T&M, which also may require T&M to file a separate motion to compel.

4529487v6

Hon. Michael A. Shipp, U.S.D.J.
September 17, 2014
Page 17

discussions regarding a universally-applicable ESI protocol, so that the parties can properly move forward with ESI discovery.

The Bankruptcy Court entered the Mediation Order prior to Plaintiffs' response deadline with respect to T&M's cross-motion, and as a result, both motions are currently stayed pending the outcome of the mediation.

## CONCLUSION

In the event that the upcoming mediation is not successful, T&M requests that the Court schedule a status conference.

We thank the Court for its time and attention.

Respectfully submitted,

*[signature]*

Joseph L. Schwartz

cc: (by ECF only)
     Kenneth Moskowitz, Esq.
     Daniel Stolz, Esq.
     William Mead, Esq.

4529487v6